

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3                        —    —    —

     FAISAL G. KHALAF, Ph.D.,
 4
              Plaintiff,
 5
        vs.                            Case No. 15-12604
 6
     FORD MOTOR COMPANY, a Delaware    Hon. Marianne O. Battani
 7   Corporation, BENNIE FOWLER and
     JAY ZHOU, jointly and
 8   severally,

 9            Defendants.
                                  /
10   _____

11                          JURY TRIAL

12        BEFORE THE HONORABLE MARIANNE O. BATTANI
                United States District Judge
13        Theodore Levin United States Courthouse
                231 West Lafayette Boulevard
14                   Detroit, Michigan
                  Tuesday, March 13, 2018
15

16

17

18

19

20

21

22

23

24
          To obtain a copy of this official transcript, contact:
25             Robert L. Smith, Official Court Reporter
               (313) 234-2612 • rob_smith@mied.uscourts.gov
```

```
 1          This is my opportunity to preview for you what I
 2   intend to show and what this case is about.  It's about a
 3   corporation and its managers that harassed, humiliated,
 4   pushed out and ultimately fired Dr. Khalaf, a 17-year
 5   employee with an outstanding performance record.
 6          It is about two high-level Ford executives,
 7   Mr. Fowler and Dr. Zhou, who are sitting at the table behind
 8   me, who thought they could get away with denigrating
 9   Dr. Khalaf who was not born in this country, because of his
10   English and his accent.
11          It is about arrogance.  It is about a corporation
12   and its managers who have decided they are above the law and
13   that they could get away with punishing and marginalizing
14   Dr. Khalaf for bringing forward very legitimate harassment
15   and discrimination complaints and a corporation that betrayed
16   an earnest, honest, extremely hard working, impeccably
17   credentialed and well-reviewed leader.
18          I intend to show you that Dr. Khalaf was
19   discriminated against, harassed, retaliated against, subject
20   to a hostile work environment, and fired.  He was kicked to
21   the curb by these defendants.
22          His treatment was so severe that he required a
23   yearlong medical leave for extreme workplace stress, which
24   his doctor you will hear attributes 100 percent to Ford Motor
25   Company.
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—   —   —

FAISAL G. KHALAF, Ph.D.,

       Plaintiff,

  vs.                   Case No. 15-12604

FORD MOTOR COMPANY, a Delaware    Hon. Marianne O. Battani
Corporation, BENNIE FOWLER and
JAY ZHOU, jointly and
severally,

       Defendants.
_____/

JURY TRIAL

BEFORE THE HONORABLE MARIANNE O. BATTANI
United States District Judge
Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan
Wednesday, March 14, 2018

*To obtain a copy of this official transcript, contact:*
*Robert L. Smith, Official Court Reporter*
*(313) 234-2612 • rob_smith@mied.uscourts.gov*

 1    A.   The first signature on top was Jay Zhou, on the left

 2    below, David Cook, Bennie Fowler, Julie Lavender.

 3    Q.   And their titles are listed on here, obviously they are

 4    director and VP-level people as well as defendant Jay Zhou,

 5    correct?

 6    A.   Correct.

 7    Q.   How did you feel about being terminated from Ford Motor

 8    Company?

 9    A.   Awful because that was always my dream, my career path,

10    my career goal, my career growth.

11    Q.   You have attended many of the depositions in this case,

12    right?

13    A.   Yes.

14    Q.   Have you attended any court hearings?

15    A.   I attended the court hearing and also Ford tried to have

16    Judge Battani dismiss this case.

17    Q.   After being cut off from disability benefits from April

18    of 2015, what income did you have?

19    A.   I had no income other than from Wayne State.

20    Q.   No other paychecks coming in, correct?

21    A.   No.

22    Q.   How much were you earning for teaching at Wayne State

23    approximately?

24    A.   Was about 7,500 per course a semester.

25    Q.   Did your bills go away?

```
 1  A.   I'm sorry?
 2  Q.   Did your bills go away?
 3  A.   No, they did not.
 4  Q.   Did your house payments for you and your extended family
 5  go away?
 6  A.   No.  Actually my expenses got higher because I had to
 7  fund my health treatment and recovery.
 8  Q.   Did your car payments go away?
 9  A.   No.
10  Q.   Were you trying to find other work seeing what was going
11  on at Ford?
12  A.   Yes.
13  Q.   And you did get a job quickly, correct -- well, strike
14  that.
15           When did you start looking for a job?
16  A.   I started looking for a job in 2015 as part of getting
17  myself acquainted with the industry in the field that I'm in.
18  Q.   Okay.  And you landed a job with BASF, correct?
19  A.   Yes.
20  Q.   At a higher salary?
21  A.   Yes.
22  Q.   Are you glad that you have a good job?
23  A.   I'm glad that I have a job.
24  Q.   Are there any negatives with respect to your current
25  employment situation?
```

1  A.   My current job requires me to travel 50 and over percent

2  of the time across North America away from my family, and

3  also I have back pain situation where that is very hard for

4  me to be on the plane most of the time.

5  Q.   When you talked about Ford trying to get the judge to

6  dismiss your case, what happened with that attempt?

7          MR. FORREST:  Objection.

8          THE COURT:  Sustained.  Let's not go into that,

9  Counsel.  That's improper.

10  BY MS. LAUGHBAUM:

11  Q.   So I intend to present your economic damages through an

12  expert, but just tell me the types of damages, money damages

13  that you have incurred.

14  A.   I incurred financial income damages, pain and suffering

15  for a long, long time.

16  Q.   How about just focusing on not the emotional distress

17  side but actual, you know, money losses, out-of-pocket type

18  of losses, just the categories that you believe you have

19  been -- that you have sustained, categories of damages you

20  have incurred.

21  A.   I have no retirement pension from BASF, and that was my

22  critical benefit and one of the primary reasons that everyone

23  wished all along to be covered in during retirement and

24  retirement healthcare.  That's what we all work for is to

25  be -- have a peace of mind when we retire.

 1    Q.   Any other financial losses that you incurred?

 2    A.   I incurred no income basically for most of 2015.

 3    Q.   Okay.  How about on the emotional distress side, what --

 4    other than what you have already told us, what can you tell

 5    us about the emotional distress claim that you are making as

 6    far as how this affected you emotionally?

 7    A.   It affected me -- it's affecting me right now, and it is

 8    never going to go away.  That horrible treatment that I hope

 9    and pray no one would have to experience and go through

10    because that stays with you for your whole life.  It will --

11    I -- as much as I try to overcome, be positive, be

12    productive, I know I live it every single day with myself,

13    with my family, with my wife.

14    Q.   Do you have a close family?

15    A.   Yes, I do.

16    Q.   Is family important to you?

17    A.   Very important.

18    Q.   Was it difficult telling your wife and your parents that

19    your career at Ford was gone?

20    A.   Yes.

21    Q.   So your father and your wife have been in the courtroom,

22    and I just didn't want to leave any doubt in the jurors' mind

23    about your relationship with your mother.  What kind of

24    relationship do you have with your mother?

25    A.   I have a wonderful and supportive relationship with my

 1   mom both ways, and actually I stepped out and updated her on

 2   what's going on, and she's praying for me.

 3   Q.   I'm sorry.  Repeat that.

 4   A.   And she is praying for me.

 5   Q.   Why isn't she here?

 6   A.   She has asthma and when she gets emotional, that affect

 7   her ability to breathe.  She wanted to be with us, but I said

 8   I care about you more than to be here.  I'll try to follow up

 9   with you on regular basis.

10   Q.   Okay.  So the jury has heard a lot from both of us --

11   well from you, maybe too much, but what can you say that you

12   haven't already conveyed about how your treatment by this

13   corporation and these defendants have impacted your life and

14   your family's life?

15   A.   I am very sad.  I always respected Ford Motor Company

16   and I had a wonderful career with Ford until Bennie Fowler

17   came on board in 2007, and from that point on the pain and

18   suffering never, never went away.

19   Q.   Did you provide some documents to our damages expert so

20   he could help calculate his estimation of your losses?

21   A.   Yes.

22   Q.   And were those -- what were those documents?

23   A.   Those documents were financial incomes from when I was

24   at Ford and today at BASF.

25   Q.   Including tax returns?

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

— — —

FAISAL G. KHALAF, Ph.D.,

      Plaintiff,

  vs.                      Case No. 15-12604

FORD MOTOR COMPANY, a Delaware    Hon. Marianne O. Battani
Corporation, BENNIE FOWLER and
JAY ZHOU, jointly and
severally,

      Defendants.
_____/

JURY TRIAL

BEFORE THE HONORABLE MARIANNE O. BATTANI
United States District Judge
Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan
Thursday, March 22, 2018

*To obtain a copy of this official transcript, contact:*
*Robert L. Smith, Official Court Reporter*
*(313) 234-2612 • rob_smith@mied.uscourts.gov*

*Jury Trial • March 22, 2018*

**166**

 1  A.   Yes.

 2  Q.   Can you put that up, please -- you know, you don't need

 3  to bother with that.

 4          So, just for the record, that's Defendant's 208.

 5  The jury has seen it many times.

 6          Did you obtain the signatures from the necessary

 7  people at Ford for plaintiff to be offered the SIRP package

 8  at the time he refused to take a job back at Ford?

 9  A.   Yes.

10  Q.   And had he accepted this package, it would have been

11  something like the CTP, there would have been some money

12  involved?

13  A.   Yeah.  I think it was six months or something at the

14  time.

15  Q.   And he would have had to sign a release to take the

16  money and avoid all of this litigation?

17  A.   Yes.

18  Q.   Okay.  And he refused to sign the release and avoid the

19  litigation?

20  A.   Yes.

21  Q.   So he left without the money?

22  A.   Yeah.  It was a choice that he made.

23  Q.   Okay.  All right.  So plaintiff testified that if he had

24  returned to Ford in September 2015 when he was offered a job,

25  that he would not have had a pension anymore with Ford, he

 1   would not have been able to continue participating in the

 2   pension plan in accruing additional retirement benefits.  Is

 3   that correct?

 4   A.   No.

 5   Q.   All right.  He also testified that had he come back to

 6   Ford in September 2015, he would have started over with the

 7   new Ford service date of 2015 as opposed to his original

 8   service date of 1999; is that correct?

 9   A.   No.

10   Q.   All right.  Let's go back in time to April 2014 when you

11   were attempting to meet with plaintiff, you and Jay Zhou,

12   Dr. Jay, about performance issues.

13        Can you put up, please -- we want to run though

14   this very quickly -- D133.  I just want to establish the

15   timeline for the jury.  All right.

16        So what is that?

17   A.   It appears to be a note from Faisal -- oh, Jay had a

18   meeting scheduled with him on -- a one-on-one, and Faisal is

19   postponing it because it conflicted with a meeting that he

20   had.

21   Q.   Okay.  Can you put up D --

22   A.   And that was April 1st.

23        MS. HARDY:  Your Honor, I move to admit D133.

24        THE COURT:  Any objection?

25        MS. LAUGHBAUM:  It's already up.  Is this what we

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

2

3

$-$  $-$  $-$

FAISAL G. KHALAF, Ph.D.,

4

Plaintiff,

5

vs.                                    Case No. 15-12604

6

FORD MOTOR COMPANY, a Delaware     Hon. Marianne O. Battani
Corporation, BENNIE FOWLER and
JAY ZHOU, jointly and
severally,

7

8

9

Defendants.

10

_____/

JURY TRIAL

11

BEFORE THE HONORABLE MARIANNE O. BATTANI

12

United States District Judge
Theodore Levin United States Courthouse

13

231 West Lafayette Boulevard
Detroit, Michigan

14

Monday, March 26, 2018

15

16

17

18

19

20

21

22

23

24

*To obtain a copy of this official transcript, contact:*
*Robert L. Smith, Official Court Reporter*

25

*(313) 234-2612 • rob_smith@mied.uscourts.gov*

 1  working -- let's say, if the employee is working elsewhere --

 2  give me one moment please.

 3         Generally the Court is required to determine

 4  whether or not front pay is appropriate if the employee is

 5  not working elsewhere, and it's for the jury to then

 6  determine the amount that's appropriate.

 7         I don't think that analysis even applies here.  My

 8  client is working somewhere else, and the question is his

 9  future pay simply relates to the pension losses that

10  Dr. Paranjpe blackboarded.

11         So if the Court agrees that the jury is entitled to

12  assess pension -- you know, look at pension losses, which I

13  presume is the case, then the question for them is how much

14  is it.  I don't think there is any question for the Court on

15  this front pay issue, and specifically pension.

16         THE COURT:  So what are the economic damages to the

17  present time?

18         MS. LAUGHBAUM:  He has -- all of his economic

19  losses, Judge, are future; they are like post-retirement

20  losses.

21         THE COURT:  So we take out A in the first one.

22         MS. LAUGHBAUM:  Right.  I mean, he did have some

23  initial losses but they are -- you know, I guess in theory

24  the Court could -- the jury could find he had past losses --

25  you know, there are documented blackboarded losses on

1   find punitive damages.

2           MR. DAVIS:  That will be allowed, Your Honor?  And

3   then we have actually agreed on a punitive damage instruction

4   prior to -- when we had our conversation last week or two

5   weeks ago.

6           THE COURT:  Okay.

7           MR. DAVIS:  So we have that.

8           MS. LAUGHBAUM:  I thought we had too, Mr. Davis,

9   although the last version you sent me didn't have sort of THE

10  bullet points about the reprehensibility of the defendants'

11  conduct, et cetera, et cetera.

12          MR. DAVIS:  Yeah, it got cut off.  I'm trying to

13  learn PowerPoint.

14          MS. LAUGHBAUM:  But nothing's changed as far as

15  what we agreed to?

16          MR. DAVIS:  Nothing's changed.  I will figure out

17  the PowerPoint issue and present that.

18          MS. LAUGHBAUM:  I think we are down to the verdict

19  form, Your Honor.

20          MR. DAVIS:  The verdict form.

21          THE COURT:  Let's me just pull that out.  Now, is

22  this form of verdict plaintiff's?

23          MS. LAUGHBAUM:  We both submitted one.  Mine has

24  about 10 questions, defendants' has about 20.

25          MR. DAVIS:  I submitted a new verdict form last

 1  night, and that has seven questions on it.

 2       THE COURT:  I'm sorry.  What?

 3       MR. DAVIS:  We submitted a new verdict form this

 4  morning at 8:00 a.m., it came in through the ECF utilities.

 5       MS. LAUGHBAUM:  I don't have that.

 6       MR. DAVIS:  It should be in the stack that the

 7  clerk handed you a while back after the special instructions.

 8       THE COURT:  Let me find it.

 9       MR. DAVIS:  Your Honor, if you have our verdict

10  form --

11       THE COURT:  You know what, I had it but I don't see

12  it here.  Oh, yes, I do, but you said you submitted a new one

13  and it is the new one I don't have.

14       MR. DAVIS:  I have the copy your clerk gave me,

15  Your Honor.  I can hand you the paper copy and work off my

16  electronic copy, if that helps.

17       THE COURT:  Okay.  Just one minute before you

18  start.  I'm going -- my secretary is going to send you -- I'm

19  just looking at the standard instructions.  These are the

20  standard instructions which will have to be tweaked for this

21  case.  Okay?

22       MR. DAVIS:  Yes, Your Honor.

23       THE COURT:  No, this isn't right.  When I get off

24  the bench I will go find mine, and I will get them to send

25  this to you.

*Jury Trial • March 26, 2018*

110

1          MR. DAVIS:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MR. DAVIS:  Your Honor, so we submitted this new

4    form which I think greatly simplifies what are very

5    complicated issues, and I think the form of it is more or

6    less consistent, with a few tweaks, as to the Court's rulings

7    today.  I think this form is easy to follow.  It really

8    specifies which claims are being brought against which

9    people, which would be helpful if the Court were to throw out

10   some of the claims on directed verdict.  The remaining

11   claims, whatever the rulings were, would be preserved there,

12   which could be helpful.  And, again, it is five questions and

13   then two damages questions, and we think this captures really

14   what the Court was getting at.

15         THE COURT:  Okay.  I'm just looking at the damages

16   ones now.  We have to take out --

17         MR. DAVIS:  Swap out backpay with pension losses, I

18   believe, Your Honor.

19         THE COURT:  Yes, right.  Okay.  And I have

20   plaintiff's verdict form.

21         Plaintiff, do you have defendants' new verdict

22   form?

23         MS. LAUGHBAUM:  I'm just looking at it now.  Your

24   Honor, it's certainly simplified from the last version.

25         A couple of things, instead of repeating has

1  plaintiff proved by a preponderance of the evidence again and

2  again and again, I would think it would be simpler to just

3  say did defendant demote, blah, blah, blah, as explained in

4  the jury instructions, rather than, you know, phrase it in

5  that way.

6       Also with respect to the hostile environment claim,

7  they have got it broken out subordinates and supervisors.  I

8  don't see that as a proper analysis.  The analysis is you

9  look at the totality of the circumstances, the totality of

10  the work environment, and determine whether or not the

11  plaintiff was subjected to a hostile environment.  You don't

12  separate it and segment it into was point A a hostile work

13  environment, was point B a hostile work environment?  Was A

14  plus B a hostile work environment?  So that I think should be

15  whittled down or condensed rather.

16       THE COURT:  Let's stop there.  Let's just take a

17  look at that.  Okay.  I agree, we've got preponderance of the

18  evidence on all of these so the standard is the same.

19       MR. DAVIS:  Your Honor, the standards are different

20  however for coworker versus supervisory, and, again, it may

21  be -- it may be -- this is one of the key things in the DV

22  and I know you don't want us to argue that now, but obviously

23  Dietlin's testimony was not allowed in where she made what we

24  said was a foundationless claim about a discriminatory

25  comment.  All we have in this case is for the coworkers;

1    there's nothing about his accent.  I'm not going to get into

2    the DV motion, but really they should be separated out

3    because there are different standards.  And if the Court were

4    to grant DV on the subordinates at a minimum we could just

5    cut that out completely.  So I think keeping them separate

6    for the record is important to find out what was the basis.

7    What did the jury thinks was discriminatory, right, Your

8    Honor?  Because if they think that the generic hostility from

9    Miller or whatever was -- they marked that off, well, then

10   that's an argument that we don't to have redo the trial on

11   appeal, the Court can say that gets thrown out.

12          So keeping these separate in light of the very

13   different legal standards and the very different types of

14   evidence that have been presented here I think is critical

15   for preserving this record.

16          MS. LAUGHBAUM:  I don't agree.  You don't look at

17   hostile work environment in a vacuum; you look at the

18   totality.  And either they are going to find that overall it

19   was hostile or it wasn't, and --

20          THE COURT:  I think it is important to look at

21   whether it was the subordinates in this case or his

22   superiors, so I will allow it in this case.  I will take out

23   though has plaintiff proved by a preponderance of the

24   evidence.  There is only one standard, preponderance of the

25   evidence, in all of these, so we can just say -- I think the

1  easiest thing to say is --

2           MS. LAUGHBAUM:  Do you find?

3           MR. DAVIS:  Or just has plaintiff proved?  We can

4  take out the preponderance phrase there -- the clause.

5           MS. LAUGHBAUM:  I would propose either do you find

6  or did any defendant discriminate -- or did any defendant

7  retaliate, et cetera, et cetera --

8           MR. DAVIS:  Well, Your Honor, the standard --

9           MS. LAUGHBAUM:  -- as explained in these

10  instructions.

11          MR. DAVIS:  The plaintiff having to prove is the --

12  that's the essence of the claim, and it is simple enough; if

13  you just say has plaintiff proved that he was subjected --

14          THE COURT:  I would take out by a preponderance of

15  the evidence.  Has plaintiff proved that he has demoted or

16  terminated?

17          MR. DAVIS:  Is that in those two instructions or

18  across the board?

19          THE COURT:  Across the board.  Even in the next

20  line by a preponderance of the evidence.  You don't keep

21  having to repeat that.

22          MR. DAVIS:  Okay.

23          MS. LAUGHBAUM:  One other point, Your Honor.  It

24  appears we are going basically with the defendants' revised

25  form.  Under discrimination national origin, both questions

*Jury Trial • March 26, 2018*

**114**

1    one and two, I'm not alleging Zhou demoted Khalaf, and I'm

2    not alleging, yeah, on either of those.  So I think that

3    should -- I don't even want there to be a blank for them to

4    address that issue; either say not applicable or plaintiff

5    does not make that -- this claim as to Zhou.

6              THE COURT:  Okay.  You are not making the claim of

7    demotion by Fowler?

8              MS. LAUGHBAUM:  No, Zhou.

9              THE COURT:  I mean Zhou, so here we will just say

10   not applicable.

11             MR. DAVIS:  Just N/A or should I write the whole

12   words not applicable, Your Honor?

13             THE COURT:  Yes, just to make sure they understand

14   what we are saying.  Anything else?

15             MS. LAUGHBAUM:  Give me one moment, please.  I

16   think maybe the punitive should be fleshed out a little more.

17             THE COURT:  One minute here.  Let me see.  Well, I

18   think we ought to have another question on punitive.  Is

19   plaintiff entitled to punitive damages?  Yes.  Then what's

20   the amount?

21             You sound here like you are asking for an amount.

22   How much?  I mean, you do say if any, but I think that's not

23   significant enough.

24             MR. DAVIS:  So 7, that says punitive damages, yes

25   or no; and then 8, that has the amount?

*Jury Trial • March 26, 2018*

**115**

1   THE COURT:  Right.

2   MR. DAVIS:  Yes, Your Honor.

3   MS. LAUGHBAUM:  And do we need the language in

4   number 5, if you answered no to all five questions, you are

5   finished?  That's fine.  And then it says your verdict is for

6   the defendants.  Do we need that your verdict is for the

7   defendants?

8   THE COURT:  Where are you?

9   MS. LAUGHBAUM:  Bottom of second page, last thing

10   under question 5.

11   THE COURT:  If you answer no to all five questions,

12   you are finished.  Your verdict is for the defendants,

13   otherwise continue.  Yes, I like that in there because I want

14   them to be clear.

15   MS. LAUGHBAUM:  Okay.

16   THE COURT:  That the --

17   MS. LAUGHBAUM:  Actually, the more I think about

18   it, I guess that's fine.

19   THE COURT:  Yeah.

20   MS. LAUGHBAUM:  Okay.  And then under damages we

21   are going to say is plaintiff entitled to an award of

22   punitive damages.  Should it say as explained in these

23   instructions, or is that unnecessary?

24   THE COURT:  I think that's not necessary because

25   every one of these questions are as explained in the

 1      instructions.

 2             MS. LAUGHBAUM:  Okay.  And this is improper -- I'm

 3      sorry.  This says nonpunitive damages.  Okay.  I'm sorry.  So

 4      last page, damages, that should just say --

 5             THE COURT:  The standard instruction says

 6      compensatory damages, that's the word that's used.

 7             MR. DAVIS:  I can change that.

 8             THE COURT:  Not nonpunitive but compensatory.

 9             MS. LAUGHBAUM:  But what they are asking -- it is

10      not backpay, it is --

11             THE COURT:  We are taking that out and saying

12      pension and health-related benefits.

13             MS. LAUGHBAUM:  Retiree health benefits, and then

14      emotional distress damages.  Can we say that?

15             THE COURT:  If you want.

16             MS. LAUGHBAUM:  Let me look back at the other

17      language we have used on that.

18             MR. DAVIS:  We are fine with that change, Your

19      Honor.

20             THE COURT:  7, you have punitive damages-Ford?

21             MR. DAVIS:  Yes, Your Honor.

22             THE COURT:  Why do you have just Ford when you

23      asked for them against Fowler and Zhou?

24             MR. DAVIS:  No, we have it for all three, Your

25      Honor.

 1          THE COURT:  I know, but if you look -- take out the

 2   Ford.

 3          MR. DAVIS:  Take that out, yeah.

 4          MS. LAUGHBAUM:  I don't think we need the if any,

 5   if any, if any four times in question number 17.

 6          MR. DAVIS:  I thought Your Honor just ruled that

 7   was appropriate but not sufficient, that's why we are adding

 8   a new instruction?

 9          THE COURT:  Yeah, we are adding another

10   instruction.

11          MS. LAUGHBAUM:  Oh, right, we are inserting is

12   plaintiff entitled as a threshold.

13          THE COURT:  Right.

14          MS. LAUGHBAUM:  And then we go to 7, but we are

15   still saying four different times if any, if any, if any, if

16   any, suggesting repeatedly, you know --

17          THE COURT:  First of all, we can take out -- if

18   they get to this question because you will have to instruct

19   them if they say yes, is plaintiff entitled to punitive

20   damages, that will be question number 7.  If yes, you answer

21   question 8, which is now our 7.  And then you will say how

22   much.  You don't take out if any for that first one because

23   they've already said there will be damages.  But then when

24   you go to Ford, Fowler and Zhou, you leave the if any because

25   they may not find punitive damages against them individually.

 1  Do you follow what I just said?

 2          MR. DAVIS:  I do, and it is also possible they

 3  could find some but not all defendants in question 7 were

 4  awarded punitives and they shouldn't have been awarded if

 5  they didn't answer yes in the previous section, so, yeah, I

 6  would agree with that, Your Honor.

 7          MS. LAUGHBAUM:  And then it says aware instead of

 8  award.

 9          MR. DAVIS:  I changed that already.

10          THE COURT:  Anything else on the instructions?

11          MS. LAUGHBAUM:  I don't believe so, Your Honor.

12          THE COURT:  Now, I want you to go over these.  You

13  are entitled to lunch, you can go to lunch.  But I want you

14  to go over them, and I know, Mr. Davis, you have a lot to do

15  to put it into PowerPoint, but I want you to go over the

16  wording of the individual instructions again together because

17  tomorrow morning we are starting closing arguments at 9:00,

18  so we don't have time to do instructions.  So if there's any

19  disputes, I need to know about it today.

20          MS. LAUGHBAUM:  You will be here this afternoon,

21  God forbid?

22          THE COURT:  I will be in all afternoon.  I have a

23  hearing from 3:00 to 4:30.  I hate to keep you until after

24  that, but if necessary we will.  We will go until we have

25  these instructions done.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—  —  —

FAISAL G. KHALAF, Ph.D.,

       Plaintiff,

  vs.                    Case No. 15-12604

FORD MOTOR COMPANY, a Delaware    Hon. Marianne O. Battani
Corporation, BENNIE FOWLER and
JAY ZHOU, jointly and
severally,

       Defendants.
_____/

JURY TRIAL

BEFORE THE HONORABLE MARIANNE O. BATTANI
United States District Judge
Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan
Tuesday, March 27, 2018

*To obtain a copy of this official transcript, contact:*
*Robert L. Smith, Official Court Reporter*
*(313) 234-2612 • rob_smith@mied.uscourts.gov*

1    of Personnel Relations, it is signed by Global Quality and

2    New Model Launch GVP, Global Vice President, and our

3    Defendant Bennie Fowler.

4            So Ford came in here and with a straight face told

5    you, oh, he wasn't fired, there was no adverse action, he

6    wasn't fired.

7            Judge Battani, you might recall, asked a few

8    questions directly of Mike Lank, the HR manager, when he was

9    on the stand, and elicited that well, yes, because the offer

10    was for a demotion and he didn't take it, his separation was

11    involuntary.  Ford also said, well, we offered him money to

12    leave.  So then the follow-up question was, well, does Ford

13    offer money to people who just quit?  And the answer was no.

14            So Ford's coming into court, despite all of that,

15    saying we never terminated him.  Shame on you, Ford.  Shame

16    on you.

17            Let me talk a little bit about BASF.  The company

18    is going to say, oh, he just jumped ship because he had this

19    great opportunity at BASF.  Well, you know what, he had an

20    offer that he didn't take.  He didn't accept that

21    September -- I believe it is a September 1st offer.  And then

22    BASF came back and said, you know what, Dr. Khalaf is a great

23    catch, we are going to sweeten the pot.  They offered him

24    more money, and he -- and that job offer was September 4th.

25    He was terminated by Ford September 1st.