# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT
100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  August 31, 2020

Mr. Thomas J. Davis
Ms. Elizabeth Phelps Hardy, Kienbaum, Hardy, Viviano, Pelton & Forrest
280 N. Old Woodward Avenue, Suite 400
Birmingham, MI 48009

Ms. Sarah E. Harrington
Goldstein & Russell, 7475 Wisconsin Avenue, Suite 850
Bethesda, MD 20814

Mr. Thomas G. Hungar
Mr. Jacob T. Spencer
Gibson, Dunn & Crutcher, 1050 Connecticut Avenue, N.W., Suite 300
Washington, DC 20036

Ms. Carol Laughbaum
Mr. Raymond J. Sterling
33 Bloomfield Hills Parkway, Suite 250
Bloomfield Hills, MI 48304

    Re:  Case Nos. 19-1435/19-1468, *Faisal Khalaf v. Ford Motor Company, et al*
         Originating Case No. : 2:15-cv-12604

Dear Counsel,

    The court today announced its decision in the above-styled cases.

    Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                        Yours very truly,

                        Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc: Mr. David J. Weaver

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0285p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

Faisal G. Khalaf, Ph.D.,

        *Plaintiff-Appellant/Cross-Appellee,*

    *v.*

Ford Motor Company; Bennie Fowler; Jay Zhou,

        *Defendants-Appellees/Cross-Appellants.*

> Nos. 19-1435/1468

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:15-cv-12604—Marianne O. Battani, District Judge.

Argued: May 6, 2020

Decided and Filed: August 31, 2020

Before: GUY, THAPAR, and BUSH, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Sarah E. Harrington, GOLDSTEIN & RUSSELL, P.C., Bethesda, Maryland, for Appellant/Cross-Appellee. Thomas G. Hungar, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellees/Cross-Appellants. **ON BRIEF:** Sarah E. Harrington, GOLDSTEIN & RUSSELL, P.C., Bethesda, Maryland, Carol A. Laughbaum, Raymond J. Sterling, STERLING ATTORNEYS AT LAW, Bloomfield Hills, Michigan, for Appellant/Cross-Appellee. Thomas G. Hungar, Jacob T. Spencer, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., Elizabeth P. Hardy, Thomas J. Davis, KIENBAUM, HARDY, VIVIANO, PELTON & FORREST, Birmingham, Michigan, for Appellees/Cross-Appellants.

---

**OPINION**

---

JOHN K. BUSH, Circuit Judge. This appeal involves claims of national origin discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws 37.2101 *et seq.*, and racial discrimination and retaliation in violation of 42 U.S.C. § 1981. The claims were brought by Faisal G. Khalaf, Ph.D., who is of Lebanese descent, against Ford Motor Company, his former employer, and Bennie Fowler and Jay Zhou, his former supervisors at Ford. Specifically, Dr. Khalaf contends that, he was subjected to a hostile work environment because of his race or national origin, and that defendants illegally retaliated against him, after he engaged in protected activities, by demoting him, placing him on a "Performance Enhancement Plan" (PEP), and ultimately terminating his employment.

The jury found that (1) Dr. Khalaf was neither demoted nor terminated by Ford because of his race or national origin; (2) neither Ford as a corporate entity nor Zhou subjected him to a hostile work environment, but Dr. Khalaf's subordinates at Ford had done so (based on national origin or race), and so had Fowler (based on national origin, but not race); and (3) Dr. Khalaf was subjected to retaliatory demotion by Ford and Fowler, retaliatory placement on a PEP by Zhou, and retaliatory termination by Ford alone, but was not subjected to retaliatory placement on a PEP by Fowler or Ford or retaliatory termination by Fowler or Zhou.

For the collective actions of all defendants, the jury awarded Dr. Khalaf $1.7 million in pension and retirement losses and $100,000 in emotional-distress damages. For the actions of Ford only, the jury awarded Dr. Khalaf $15 million in punitive damages. The district court granted Ford's motion for remittitur of punitive damages but denied all of defendants' other post-verdict motions, including motions for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). As to remittitur, the district court determined, in light of all of the evidence, that the exemplary damages imposed on Ford were "so excessive as to shock the conscience" and violated due process. Therefore, the court reduced the punitive damages award to $300,000.

For the reasons outlined below, we hold that the district court erred in denying defendants' motions for judgment as a matter of law. Accordingly, we **REVERSE** and direct the district court to enter judgment in favor of defendants. Based on this holding, we need not address remittitur.

## I. BACKGROUND

### A. Dr. Khalaf's Employment at Ford

In 1999, Ford hired Dr. Khalaf as a full-time non-management process engineer. R.134, 3.12. Tr., PageID 5655. During much of his career at Ford, Dr. Khalaf was a technical specialist responsible for working on projects involving Six Sigma methodology.[1]  *Id.* at PageID 5655, 5678. In his early years in that capacity, Dr. Khalaf did not gain extensive experience managing other employees. Nonetheless, in 2002, he attained "Leadership Level (LL)" 6, Ford's lowest managerial level.[2] Three years later, in 2005, Dr. Khalaf moved up to an LL5 position. R.134, 3.13. Tr., PageID 5663-5664.

In 2006, Dr. Khalaf met the new Vice President of Global Quality at Ford, Bennie Fowler. During the conversation, Dr. Khalaf shared information about his educational and professional background. Dr. Khalaf also told Fowler that he had immigrated from Lebanon and spoke Arabic. R.134, 3.13 Tr., PageID 5671-5672.

In 2007, Fowler reorganized the Global Quality Department and eliminated Dr. Khalaf's position. *Id.* at PageID 5673. According to Dr. Khalaf, he had been assured by another manager that, even with his job gone, he would remain at the LL5 level, though it would require a new reporting relationship. However, as Dr. Khalaf later learned, this was incorrect, as Fowler then assigned him to an LL6 position. *Id.* at 5673-5674. Nonetheless, pursuant to Ford's "in-grade protection" policy, Dr. Khalaf was permitted to maintain the same salary and benefits of an LL5 while serving as an LL6. *Id.* at PageID 5675; R.135, 3.14.Tr., PageID 5839-5840.

---

[1]Sigma is a set of statistical problem-solving tools that are used by companies, like Ford, to eliminate manufacturing process defects with the goal of yielding cost savings.

[2]Each Ford management employee is assigned to one of six levels. The levels advance from LL6, which is the lowest level of management, to LL1, which is the highest, held by those in the position of vice president and above. R.134, 3.13. Tr., PageID 5656.

In January 2008, Fowler approved a job transfer for Dr. Khalaf to Brazil. R.137, 3.19.Tr., PageID 6129. According to Fowler, this international role was a "high-rank assignment[]" for Dr. Khalaf that "not everyone [at Ford] had the opportunity" to hold. R.134, 3.13.Tr., PageID 5683. The position was intended to last two years, with Dr. Khalaf supervising four or five Ford employees. R.140, 3.22.Tr., PageID 6884. However, after just one year in his new job, Dr. Khalaf was sent back to the United States by his supervisor, Ruebens Vaz—a decision that, according to Ford, resulted from Dr. Khalaf's "lack of management skills" and adverse effect on "the morale of the team" he was supervising. *Id.* at 6885, 6890; *see id.* at 6890 (supervisor explaining that Dr. Khalaf had "lost the team," and therefore, the supervisor "had to make the decision to . . . end the assignment"). Upon Dr. Khalaf's return to the United States, he immediately accused Vaz of discrimination and harassment based on race or national origin, and mistreatment during one-on-one meetings. R.135, 3.14.Tr., PageID 5831-5833, 5835.

Fowler assigned Dr. Khalaf to a new job as a "Quality Functional Leader (QFL)" in Ford's Quality Strategy and Productive Placement Department (QS&PP Department), R.134, 3.14.Tr., PageID 5840; R.137, 3.19.Tr., PageID 6130, which is part of Ford's Global Quality Organization. In this group, Dr. Khalaf worked as an LL6 on cost-savings projects for Ford. R.135, 3.14.Tr. PageID 5674-5675. According to Ford, Dr. Khalaf was deliberately placed as an LL6 through the company's "Individual Grade Protection" Program. Under this program, a returning international-service employee retains the Leadership Level held during the foreign assignment for a limited time as the employee seeks a job to restore the higher Leadership Level that the employee held prior to the foreign assignment. *Id.* at PageID 5839–5840.

In June 2012, following the resignation of the QS&PP Department manager, Fowler appointed Dr. Khalaf as an interim manager of this department. Shortly thereafter, the appointment became permanent, R.136, 3.15.Tr., PageID 6009, 6014; R.135, 3.14.Tr., PageID 5706, 5710–5714, 5746; R.136, 3.15.Tr., PageID 6010–6012, and Dr. Khalaf again became an LL5. R.135, 3.14.Tr., PageID 5746. In this new management role, Dr. Khalaf oversaw two teams of Ford employees: (1) QFLs (Dr. Khalaf's former job), who worked on cost-saving projects; and (2) Quality Analysts, who were responsible for gathering data and preparing detailed PowerPoint presentations for Ford's weekly "Business Plan Review" (BPR) meetings.

R.135, 3.14.Tr., PageID 5703, 5707.  BPR meetings, as Ford explains, were essential strategy sessions with Ford's executive leadership team.[3]  The BPR presentations involved lengthy reports (of approximately 500 pages) and critical quality data about Ford's vehicles.  R.138, 3.20.Tr., PageID 6466–6470.  Given the importance of the meetings, Fowler testified, he always "needed the information to be timely" and "free from errors."  R.137, 3.19.Tr., PageID 6121.  That standard was not met by Dr. Khalaf's team, according to Fowler.  Compounding the problem, Fowler was disappointed with Dr. Khalaf's leadership of his team at the time.  Particularly, while Fowler had expected Dr. Khalaf "to establish the relationships with the team" and "spend time learning what the standards are, learning what the information is, and working with the teams from the business office," Dr. Khalaf seemed to struggle with this role.  Indicative of this, in June 2013, Kim Harris, one of the employees directly reporting to Dr. Khalaf, recorded that as a result of Dr. Khalaf's management style, the  "[d]epartment is in [t]urmoil (extremely high stress levels, some have had to seek counseling, many applying to get out of th[is] department)."  R.79-12, PX27, PageID 2487.

### B.  Dr. Khalaf's Alleged Protected Conduct

Dr. Khalaf alleges three instances of protected conduct in support of his retaliation claims against Jay Zhou, to whom Dr. Khalaf reported from August 2013 to June 2014.

The first involved a heated phone call between two employees in Dr. Khalaf's department, Pauline Burke and David Buche, in February 2013.  This exchange reportedly involved discussion of cost-saving measures.  Buche allegedly told Burke to "be a big girl and come up with the savings."  R.79-7, PX15, PageID 2459.

Upon learning of the phone exchange, Dr. Khalaf directed Burke to send a "claim" to Human Resources (HR).  R.79-8, PX16, PageID 2469.[4]  In her HR submission, Burke indicated she had a "right to work in a non-hostile environment."  However, in neither Burke's filing nor

---

[3]The weekly meetings involved separate sessions with Fowler's QS&PP Department and with Ford's CEO and his leadership team.  R.136, 3.15.Tr., Page ID 6094-6104.

[4]Dr. Khalaf also notified HR that he had "asked Pauline to file a claim with HR because she made accusation [*sic*] over a discussion she had with David Buche yesterday."  R.79-7, PX15, PageID 2459.

subsequent email exchanges between Dr. Khalaf and HR did Burke or Dr. Khalaf ever characterize the phone conversation as involving sexual discrimination or sexual harassment. *See id.*; R.79-8, PX16, PageID 2468–2469.

The second instance of protected conduct referenced by Dr. Khalaf involved an email he sent in June 2013 to Wendy Warnick, a Human Resources manager at Ford. *See* R.37-14, PX26, PageID 1176-1180. Prior to sending the email, Dr. Khalaf had approached Fowler, alleging hostile treatment by his subordinates. Fowler responded to Dr. Khalaf's concerns by directing Dr. Khalaf to ask that Warnick transition the hostile subordinates to a different part of the company. R.135, 3.14.Tr., PageID 5744-5745. Adhering to Fowler's instruction, Dr. Khalaf sent an email to Warnick, in which he outlined the hostile treatment he had faced by his subordinates, and explained that the subordinates' direct supervisor, Kim Harris, had refused to hold them accountable. *Id.* at PageID 5745; R. 37-14, Warnick Email, Page ID 1176-1179. Dr. Khalaf characterized the collective actions of his subordinates as creating a hostile work environment. R.37-14, PX25, PageID 1176-1179. According to Dr. Khalaf, HR's response was to do nothing. R.135, 3.14.Tr., PageID 5745. Frustrated with the inaction, Dr. Khalaf approached Fowler again about his subordinates. *Id.* at PageID 5745-5746. At that point, Fowler responded that Ford would not relocate the hostile subordinates, and Dr. Khalaf would just have to "deal with it." *Id.* at PageID 5746.

The final instance of protected conduct referenced by Dr. Khalaf involved his filing another complaint to HR on April 4, 2014, approximately three weeks before he was placed on the "performance-enhancement-plan" (PEP) by Zhou. *Id.* at PageID 5782, 5787-5787; R.140, 3.22.Tr., PageID 6840-6841. In the email, Dr. Khalaf specifically alleged that he was being subjected to a hostile work environment by Zhou and Fowler, and that he was being retaliated against for his protected activity. R.135, 3.14.Tr., PageID 5783; PX64, R.79-24, HR Email, PageID 2536. Several days after Dr. Khalaf's filing of the complaint, he met with HR officer Les Harris. During this encounter, Dr. Khalaf offered further explanation of his April 4 complaint, stating that he was reporting discrimination and harassment based on his national origin, which included Fowler's abusive treatment of him in one-on-one meetings and Fowler's

demands that Dr. Khalaf—and only Dr. Khalaf—fetch Fowler coffee in larger meeting settings. R. 135, 3.14.Tr., PageID 5785-5786.

### C.  Fowler's Re-Organization of the QS&PP Department

Fowler testified that even after several months as department manager, Dr. Khalaf in 2013 was still failing to prepare the BPR in a satisfactory manner.  R.137, 3.19.Tr., PageID 6122.  Additionally, Dr. Khalaf continued to encounter difficulties in managing his team, as documented by "Pulse" surveys,[5] completed by Dr. Khalaf's subordinates in August and September 2013.  R.138, 3.20.Tr., PageID 6388-6390; R.137, 3.19.Tr., PageID 6167; *see also id.* at PageID 6252.  One particular report indicated that Dr. Khalaf received a rating of "30" from his subordinates based on their dissatisfaction with him as a supervisor.  Ford characterized this score as "shocking[ly] low."  In fact, it was the "lowest" score to ever be recorded in the QS&PP Department.  R.137, 3.19. Tr., PageID 6256, 6265.

According to Fowler, Dr. Khalaf's sub-optimal scores, as well as "[a] lot of errors in [Dr. Khalaf's] presentation," led Fowler to reorganize the QS&PP Department.  R.136, 3.15.Tr., PageID 6029.  The first change he made was to appoint Zhou as manager of the department.  *Id.*; R.135, 3.14.Tr., PageID 5755-5756; R.137, 3.19.Tr., PageID 6166.  Fowler then created a new LL5 position, "Lead QFL," which he assigned to Dr. Khalaf.  This position relieved Dr. Khalaf of his prior responsibility to manage the Quality Analysts, though he would still supervise the QFLs.  R.135, 3.14.Tr., PageID 5756; R.136, 3.15.Tr., PageID 6029.  As Lead QFL, Dr. Khalaf retained the same pay and benefits as his prior position, but he now reported directly to Zhou.  R. 137, 3.14.Tr., PageID 6124-6125.

### D.  Dr. Khalaf's Performance as Lead QFL

In a November 2013 performance assessment conducted by Zhou, Dr. Khalaf received an "Achiever" rating, which, according to Zhou, is the "average rating . . . that most [Ford employees] get."  R.137, 3.19.Tr., PageID 6261.  However, Zhou informed Dr. Khalaf that he

---

[5]Ford used the annual "Pulse" surveys to solicit input from employees regarding their supervisors and workplace.  R. 138, 3.20. Tr., PageID 6388-6390; R. 137, 3.19. Tr., PageID 6167.  According to the company, "[t]he Pulse score is the most reliable process" at Ford "to get the feedback from the people in the organization."  *Id.*

was "trending toward a lower achiever" rating. *Id.* In his written evaluation, Zhou indicated that Dr. Khalaf's "leadership & supervisory skills need to be addressed." R.82-5, DX26, PageID 2899. Underscoring this assessment, Zhou offered examples of what he believed were Dr. Khalaf's sub-optimal leadership characteristics, including his inabilities to (1) "own[] an issue" versus decide it was "out of [his] control"; (2) "acknowledg[e] a concern & [] delegat[e] for resolution"; and (3) "deal[] with difficult situations, communication skills, team motivation & leadership engagement." *Id.* According to this written assessment, improvement would require Dr. Khalaf to address his "PULSE [ratings], personnel relations issues, morale, relationships, & decision making." *Id.* at PageID 2900. Finally, Zhou warned that "[i]f there [was] not sustained improvement," Dr. Khalaf would "be placed on a PEP." *Id.*

After providing this evaluation, Zhou made efforts to assist Dr. Khalaf with his leadership skills. Zhou shared with Dr. Khalaf resources, available through Ford's website, that could aid employees with "leadership and development and communications skills development." R. 37, 3.19.Tr., PageID 6262. However, according to Zhou, when he met with Dr. Khalaf in January 2014, Dr. Khalaf continued to deny his "responsibility on the items highlight[ed] in the performance [review]." R.137, 3.19. Tr., PageID 6265.

## E. Dr. Khalaf's Initial Placement on a "Performance Enhancement Plan"

Dr. Khalaf's management problems with his teams persisted into March 2014. During that month, Dr. Khalaf's direct supervisees met with Zhou to "complain[] about . . . the leadership behaviors of Dr. Khalaf" and discuss "how people [were] mistreated" within the group. R.137, 3.19.Tr., PageID 6214-6215. According to Zhou, one employee in particular wanted "to change job[s]" because the stress of dealing with Dr. Khalaf was "affecting [that employee's] health." R.138, 3.20.Tr., PageID 6394. Upon concluding that the "team was destroyed by [Dr. Khalaf]," R.137, 3.19.Tr., PageID 6214, Zhou decided to place him on a PEP. R.137, 3.19.Tr., PageID 6213. An HR representative, who was directly responsible for Dr. Khalaf's department, decided a 30-day PEP, as opposed to a 60-day PEP, would be most appropriate, given that members of HR had "already coached [Dr. Khalaf] on [] issues [related to his leadership performance]." R.82-5, DX132, PageID 2902. Nonetheless, as HR noted at the

time, if Dr. Khalaf did not improve during his initial 30-day PEP, this plan would be "extend[ed] to a second 30[-]day PEP with [Career Transition Plan] language." *Id.*

The first PEP was set to commence on April 4, 2014. On that day, Zhou scheduled a meeting with Dr. Khalaf at which he planned to deliver news of the PEP. But, before the meeting could take place, Dr. Khalaf canceled the appointment. He indicated to Zhou that he would be "working from home" on April 4 instead. R.82-5, DX135, PageID 2909; R.137, 3.19.Tr., PageID 6273–6274.

On the afternoon of April 4, Dr. Khalaf then submitted an official complaint to HR, in which he stated that he had been harassed by Fowler and Zhou. R.79-24, PX64, PageID 2536. As discussed above, his act represented the third instance of "protected conduct" that Dr. Khalaf referenced in support of his retaliation claim against Zhou. However, nowhere in Dr. Khalaf's complaint or within any other correspondence he sent to HR related to the alleged harassment, did Dr. Khalaf ever state that Fowler had criticized his English. *Id.*; R.136, 3.15.Tr., PageID 5899.

On April 23, 2014, Zhou finally delivered the PEP to Dr. Khalaf. Shortly thereafter, when Dr. Khalaf asked HR supervisor Mike Lank why he was being placed on a PEP, Lank responded to him, "you had your chance when you filed your complaint." R.135, 3.14.Tr., PageID 5789. During the months thereafter, Zhou met with Dr. Khalaf on a weekly basis in order to review Dr. Khalaf's progress and offer feedback. R.82-5, DX159, PageID 2944; R.137, 3.19.Tr., PageID 6281–6262, 6285–6293.

**F. Dr. Khalaf's Second PEP and His Disability Leave**

Dr. Khalaf failed to complete the first PEP successfully and therefore was placed on a second PEP. R.137, 3.19.Tr., PageID 6294. This PEP stated that if Dr. Khalaf did not "demonstrate significant and sustained improvements," his employment could be terminated. DX164, App.4; *Id.*, App.3. On June 27, 2014, the day the second PEP was scheduled to end, Dr. Khalaf filed for a disability leave of absence, claiming he was "totally disabled from working." R.135, 3.14.Tr., PageID 5842–5843. According to Dr. Khalaf, his need for a leave of absence

stemmed from emotional strain he had experienced at work.  He also indicated he had taken antidepressants and anti-anxiety medication since March 2014.  *Id*. at PageID 5794, 5796.

Throughout this period, Dr. Khalaf had consulted with his family physician, as well as a psychologist, Dr. Michael Katz.  *Id.* at 5795-5796.  The latter diagnosed Dr. Khalaf with post-traumatic stress disorder (PTSD), based on Dr. Khalaf's symptoms, which included difficulty sleeping, nightmares, stress, muscle tension, extreme anxiety, and depression.  R.137, 3.19 Tr., PageID 6317-6319, 6324-6330.  Defendants dispute Dr. Katz's PTSD diagnosis and claim that he made it prematurely, after seeing Dr. Khalaf on only one occasion.  Appellees' Br. at 56-57.

Dr. Khalaf remained on medical leave from Ford for approximately one year.  R.135, 3.14.Tr., PageID 5803.  Based on the terms of Ford's disability insurance policy, he was paid 100 percent of his salary for the first twelve weeks of his disability leave and 60 percent for the remainder of the year.  *Id*. at 5796-5797.  In compliance with Ford's requirements under the policy, Dr. Khalaf's physician and psychologist submitted paperwork at approximately one-month intervals, which confirmed Dr. Khalaf's need for a medical leave.  *Id.* at PageID 5797.  It eventually came to light, however, that Dr. Khalaf was teaching at a local college, Wayne State University.  *Id*. at PageID 5801, 5843-5844.

With his disability benefits ending, Dr. Khalaf indicated that he would return to Ford in July 2015.[6]  *Id.* at PageID 5804.  Ford responded to Dr. Khalaf that his prior Lead QFL role had been filled by another employee.  R.139, 3.21.Tr., PageID 6559.  Consistent with Ford's leave policy, the company placed Dr. Khalaf on a "no work available" status for a 30-day period.  *Id.* at 6566.  During this time, a search was conducted across the company for an open job commensurate with Dr. Khalaf's skills, experience, and LL5 designation.  The search particularly focused on opportunities within the Global Quality Organization, as well as Manufacturing Operations and Powertrain Program Engineering and other groups, including the Material Handling Organization, the Product Development Group, the Vehicle Operations Manufacturing Engineering Group, and New Models departments.  R.139, 3.21.Tr., PageID

---

[6]The parties dispute whether Dr. Khalaf's disability benefits were terminated or had run out under the terms of Ford's disability plan.

6565, 6568, 6583, 6582-6590. According to Ford, the search found no LL5 openings. *Id.* at PageID 6586.

Dr. Khalaf disputes that there were no LL5 openings, claiming that his own investigation of Ford Motor Company's career website revealed "[m]any" jobs that were available and possibly consistent with his qualifications. R.135, 3.14.Tr., PageID 5805. However, Dr. Khalaf pointed to no specific job that was available. *Id.* at PageID 5805-5806. Regardless, however, Dr. Khalaf did not dispute that Ford eventually located a Global Quality supervisor position within Ford's Quality Organization that reasonably matched Dr. Khalaf's skills and experience.[7] R.139, 3.21.Tr., PageID 6596. Though the position was at the LL6 level, it offered the same salary as Dr. Khalaf's pre-disability-leave LL5 job, while providing comparable benefits and the potential for him to get another LL5 position in the future. *Id.* The new assignment also would accommodate Dr. Khalaf's specific request that he not report directly to either Zhou or Fowler. *Id.* at PageID 6606.

Dr. Khalaf rejected the job offer. R.135, 3.14.Tr., PageID 5806-5807, 5824–5825; R.80-12, PX122, PageID 2587; R.80-14, PX132, PageID 2597. Consequently, on September 1, 2015, Dr. Khalaf was officially separated from Ford under a designated program that would have offered him a severance package. However, Dr. Khalaf rejected the severance package, given that acceptance was contingent on his signing a release form. R.140, 3.22.Tr., PageID 6871. Dr. Khalaf accepted a higher salary job at BASF, another Michigan-based-corporation. This new position also offered Dr. Khalaf a signing bonus.

### G. Procedural History

#### 1. The Jury's Findings

In July 2015, Dr. Khalaf sued Ford, Fowler, and Zhou. R.1, Complaint, PageID 2. He amended the complaint in May 2017. R.45, Amended Complaint, PageID 1820. He alleged violations of 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et*

---

[7]This position was located within Ford's Global Quality Organization, the same group that Dr. Khalaf had formerly worked in as a QS&PP manager.

*seq.*; Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws, 37.201 *et seq.*; and 42 U.S.C. § 1981. In March 2018, the case was tried before a jury, which returned the following verdicts.

First, the jury concluded that Dr. Khalaf had been neither demoted nor terminated by Ford on account of his race or national origin. Second, the jury determined that neither Ford as a corporate entity nor Zhou had subjected Dr. Khalaf to a hostile work environment. However, the jury did find that Dr. Khalaf's subordinates had subjected him to a hostile work environment based on national origin or race, and that Fowler had subjected him to a hostile work environment based on national origin, but not race. Finally, the jury agreed with Dr. Khalaf's claims that he had been subjected to retaliatory demotion by Ford and Fowler, retaliatory placement on a PEP by Zhou, and retaliatory termination by Ford. Nonetheless, the jury rejected Dr. Khalaf's contentions that he had been subjected to retaliatory placement on a PEP by Fowler or Ford, and that he had been subjected to retaliatory termination by Fowler or Zhou. R.74, Jury Verdict Form, PageID 2400-2401.

Based on these findings, the jury awarded Dr. Khalaf $1.7 million in pension and retirement losses, $100,000 in emotional distress damages, and $15 million in punitive damages, with the latter award to be imposed against Ford alone.

## 2. Post-Verdict Motions

After the jury returned the verdict, the district court indicated its initial inclination to grant judgment as a matter of law (JMOL) in Ford's favor on the Dr. Khalaf's retaliatory termination claim. R.143, 3.28.Tr., PageID 7237-7238. However, the court decided to delay ruling definitively until it after it had evaluated defendants' post-verdict motions in their entirety.

On July 23, 2018, the district court issued an opinion and order on the entry of judgment. Here again, the court deferred its decision on whether to grant JMOL to Ford on the termination claim, indicating it would do so eventually upon ruling on all of the post-judgment motions. R.95, PageID 3952-3953. Immediately thereafter, the court entered judgment in Dr. Khalaf's favor, which reflected the compensatory and punitive damages awards, in addition to interest, costs, and attorney's fees, as allowable by law. R.99, Judgment, PageID 3964.

On August 20, 2018, defendants filed the following motions: (1) for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b); (2) for a new trial pursuant to Rule 59(a); (3) to alter or amend the judgment pursuant to Rule 59(e); and (4) for remittitur.  R.102, New Trial Motion, PageID 4084-4122.

On March 28, 2019, the district court granted defendants' motion for remittitur and reduced the punitive damages from $15 million to $300,000.  However, the district court denied defendants' motions for JMOL, to alter or amend the judgment, or to grant a new trial.  R.115, Order, PageID 5111-5130.

Dr. Khalaf subsequently filed an appeal of the district court's remittitur, while defendants cross-appealed the district court's denial of their motions for JMOL or a new trial.[8]

## II.  DISCUSSION

We focus our discussion on the motion for judgment as a matter of law because its resolution is dispositive of this appeal.  We review a district court's denial of a JMOL motion de novo.  *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005).  We consider "the evidence in the light most favorable to the non-moving party."  *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) (internal quotations omitted).  Judgment as a matter of law is appropriate if "there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party."  *Id.* (internal quotations omitted).

"When reviewing the facts of a discrimination claim after there has been a full trial on the merits," this court will consider the "evidentiary underpinnings of a plaintiff's prima facie case" to decide whether the "plaintiff has proven [his] case by a preponderance of the evidence."  *Barnes*, 401 F.3d at 736 (original brackets omitted).  This review "focus[es] on the ultimate question of [the existence of] discrimination rather than on whether a plaintiff made out a prima facie case."  *Id.*

---

[8]Defendants did not appeal the district court's denial of their motion to alter or amend the judgment.

### A. Alleged Hostile Work Environment

First, we consider the hostile-work-environment claims alleged against Ford (based on the actions of Dr. Khalaf's subordinates) and Fowler (Dr. Khalaf's supervisor). The jury found that (1) Dr. Khalaf's subordinates had subjected him to a hostile work environment based on national origin or race (thereby implicating Ford as a corporation); and (2) Fowler had subjected Dr. Khalaf to a hostile work environment based on national origin, but not race. However, the jury also found that neither Ford's corporate conduct nor Zhou's individual conduct had subjected Dr. Khalaf to a hostile work environment.

For the reasons discussed below, we hold that the evidence is insufficient to support a finding of defendants' liability on Dr. Khalaf's claims of hostile work environment. Therefore, we **REVERSE** the district's court's denial of defendants' motion for JMOL on these claims.

To allege a hostile work environment claim based on race or national origin under Title VII or the ELCRA, a plaintiff must demonstrate that "(1) [he] belongs to a protected class; (2) [he] was subject to unwelcome harassment; (3) the harassment was based on race [or national origin]; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known about the harassment and failed to take action." *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017); *see Boutros v. Canton Reg'l Transit Auth.*, 997 F.2d 198, 203 (6th Cir. 1993) (applying analysis to national-origin based claim); *see also Phillips*, 854 F.3d at 327 n.3 ("The elements are substantially the same for [the] ELCRA claim."); *Quinto v. Cross & Peters Co.*, 547 N.W.2d 314 (Mich.1996). When evaluating these claims, this court "look[s] at the totality of the alleged [] harassment to determine whether it was 'sufficiently severe or pervasive to alter the conditions of [a plaintiff's] employment and create an abusive working environment.'" *Phillips*, 854 F.3d at 327 (quoting *Williams v. CSX Transp. Co.*, 643 F.3d 502, 512 (6th Cir. 2011) (alteration in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993))). The circumstances we consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Phillips*, 854 F.3d at 327 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (internal citation omitted)).

"[T]his court has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory."  *Phillips*, 854 F.3d at 328.  "[O]ccasional offensive utterances do not rise to the level required to create a hostile work environment because, '[t]o hold otherwise would risk changing Title VII into a code of workplace civility.'"  *Id.* at 327 (quoting *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008)).  For example, in the context of alleged racial discrimination, this court has determined that "even offensive and bigoted conduct is insufficient to constitute a hostile work environment if it is neither pervasive nor severe enough to satisfy the claim's requirements."  *Id.* at 328; *see also Clay v. United Parcel Service*, 501 F.3d 695, 707–08 (6th Cir. 2007).

Ford disputes Dr. Khalaf's surviving hostile-work environment claims against his subordinates and Fowler.  As to the charges against Dr. Khalaf's subordinates, Ford argues that he failed to present any evidence that their alleged harassment of him  was  "based on race [or national origin]," *Phillips*, 854 F.3d at 327, and relatedly, that he failed to introduce proof indicating the allegedly discriminatory harassment by his subordinates was sufficiently "pervasive [or] severe enough."  *Williams*, 643 F.3d at 506, 513; *see also Clay*, 501 F.3d at 707– 08.  As to Dr. Khalaf's claim against Fowler, Ford argues that Fowler's alleged criticism of Dr. Khalaf's English skills is insufficient evidence of national-origin discrimination.  We address this proof in more detail below.

### 1.  Hostile Work Environment Allegedly Created by Dr. Khalaf's Subordinates

#### a.  Absence of Harassment "Based on Race or National Origin"

In support of his claim of harassment by his subordinates, Dr. Khalaf described specific instances of "disrespect" by employees Jim Miller, Les Javor, and Pauline Burke.  R.135, 3.14. Tr., PageID 5733.  According to Dr. Khalaf, Miller hung "up the phone on [him] two or three times," and "when [Dr. Khalaf] would give [Miller] an assignment, [Miller] would say do it yourself."  *Id.* at PageID 5733-5734.  In addition, Dr. Khalaf described how Javor was "[v]ery disrespectful" towards him, and "did not accept assignments from [him]."  *Id.* at PageID 5737. Dr. Khalaf also testified that "Burke had an issue with [his] performance review comments made

to her" and "would not be happy with [him]" unless he changed them.  *Id.* at PageID 5762, 5783–5784; R.139, 3.21.Tr., PageID 6657–6660; R.140, 3.22.Tr., PageID 6728–6729; *see also* Appellant's Br. at 10-12.

Dr. Khalaf further referenced anonymous comments submitted by Ford employees in a survey circulated by Ford at the end of 2012.  In these responses, as Dr. Khalaf notes, several individuals submitted "'extremely disrespectful and hostile comments' about [his] English-language skills." R.135, 3.14.Tr., PageID 5741-5743.  However, Dr. Khalaf admits that these comments were directed specifically to his "writing and understanding" of English, and did not reference his speech or accent.[9] *Id.*

Although, subjectively, these statements from subordinates could have been offensive to Dr. Khalaf, none of these alleged incidents of disrespect[10] demonstrates that his subordinates made any comments because of Dr. Khalaf's Lebanese origin or Middle Eastern ethnicity, as required for him to prove a hostile work environment.

Title VII does "not prohibit all verbal or physical harassment in the work place; it is directed only at 'discriminat[ion] . . . because of'" protected characteristics under the statutes. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).  Mere disrespect or antipathy will not be actionable under the statute unless a plaintiff can prove that such was motivated by discriminatory animus.  *See id.*  The "conduct of jerks, bullies, and persecutors is simply not

---

[9]In addition to the anonymous comments made by his subordinates in the 2012 survey, Dr. Khalaf references on appeal one comment in particular made by a Ford employee, Rick Radners, that a "[c]ultural block . . prevents [Dr. Khalaf] from being effective" and that Dr. Khalaf was "[r]aised differently."  Appellant's. Resp. at 14 (quoting R.80-7, PX81, PageID 2575).  However, this comment was made by Radners in April 2014, *after* Dr. Khalaf had ceased managing the group of subordinates (the Quality Analysts), of which he complained during the trial.  *See id.*; DX70, App.1.  Radners was a Quality Functional Lead, not a Quality Analyst, and Dr. Khalaf never suggested during his testimony that Radners engaged in any disrespectful conduct, *see* R.139, 3.21.Tr., PageID 6517, 6660, nor does he even reference Radners by name in his appellate briefing.  Therefore, we will not conduct an analysis of Radners's allegedly discriminatory comment towards Dr. Khalaf because the comment does not represent evidence of discrimination that Dr. Khalaf claimed at trial supported his claim of harassment by his subordinates.

[10]The evidence Dr. Khalaf presented regarding subordinates' alleged harassment consists of largely his own testimony.  The only testimony he presented from others was that of Michelle Dietline, who stated that Dr. Khalaf's subordinates did "disrespect" him.  However, here too, this evidence does not prove any presence of anti-Arabic or anti-Lebanese bias attributable to Dr. Khalaf's subordinates.  *See* R.136, 3.15 Tr., PageID 5951-5954, 5983-5984, 5993.

actionable under Title VII unless they are acting because of the victim's [protected status]." *Wasek v. ArrowEnergy Servs., Inc.*, 682 F.3d 463, 467 (6th Cir. 2012).

When denying defendants' JMOL motion, the district court did acknowledge that "the bulk of the evidence presented demonstrated disrespect by [Dr. Khalaf's subordinates." R.115, JMOL Order, PageID 5120. Such disrespect, standing alone, is not enough to show unlawful discrimination. But, the district court deemed significant one "anonymous comment left in a drop box [by a Ford employee] that criticized [Dr. Khalaf's] 'writing and understanding English.'" R.115, JMOL Order, PageID 5120. Although this comment made no explicit mention of Dr. Khalaf's English speaking abilities, the district court considered the comment to be "relat[ed] to [Dr. Khalaf's] accent." *Id.*

As noted above, we have held that in certain circumstances, discrimination based on accent "can be national origin discrimination." *Ang v. Proctor & Gamble Co.*, 932 F.2d 540, 549 (6th Cir. 1991) (citing *Berke v. Ohio Dep't of Pub. Welfare*, 628 F.2d 980, 981 (6th Cir. 1980) (per curiam)). However, this is a fine line, and each factual scenario must be evaluated contextually, considering that "[u]nlawful discrimination does not occur . . . when a Plaintiff's accent affects his ability to perform the job effectively." *Id.* (citation omitted). For example, in *Igwe v. Salvation Army*, we concluded that there was no evidence of national-origin discrimination towards the plaintiff-employee, given that a single comment by another company employee regarding the plaintiff's "broken speech" related to concern about the plaintiff's "communication skills," as opposed to being motivated by discriminatory animus towards his national origin. 790 F. App'x 28, 36 (6th Cir. 2019). Similarly here, the comments about Dr. Khalaf's English skills (which did not reference Dr. Khalaf's accent) related to frustration expressed by Dr. Khalaf's subordinates about their manager's ability to manage and communicate clearly with them in preparation for the weekly BPR meetings—a critical activity performed by the group. Because clear communication skills are a fundamental skillset required of managerial positions across the United States, and such ability was a necessary part of Dr. Khalaf's specific role as QS&PP Department Manager, there is simply no basis, without more evidence, to infer that the comments were motivated by discriminatory animus.

Nor is there legal merit to Dr. Khalaf's alternative argument for finding discrimination by his subordinates, which he calls a "differential treatment" theory. He claims that his subordinates treated him differently as compared to how they treated his "predecessor Mike Hardy—who is white and American born." Appellant's Resp. 15. As foundation for this argument, he references (1) his testimony that Les Javor had a "smooth relationship" with Hardy, 4.135, 3.14.Tr., PageID 5735; and (2) Michelle Dietlin's testimony that Jim Miller "wasn't interested in doing work that wasn't specifically requested by Mike Hardy." R.136, 3.15.Tr., PageID 5953.

This court has held that a comparison between one member of a protected class and one employee outside of that protected class is not "comparative evidence about how the alleged harasser[s] treated *members* of both races in a mixed-race workplace." *Williams*, 643 F.3d at 511 (emphasis added). Furthermore, none of the cases referenced by Dr. Khalaf supports the theory that differential treatment of only *two* individuals, as compared to differential treatment of *all* individuals in the relevant racial categories, demonstrates discriminatory animus under a "differential treatment" theory. Finally, the two pieces of testimony about Javor and Miller do not demonstrate that the subordinates refused assignments on account of Dr. Khalaf's race or national origin. In fact, this testimony leaves open a number of non-discriminatory rationales to account for the feelings expressed by the employees, including potentially the fact that they simply preferred Mike Hardy's management style.

Therefore, we determine that Dr. Khalaf failed to introduce sufficient evidence to allow a reasonable jury to find the requisite discriminatory animus from his subordinates based on race or national origin.

### b.   Absence of Sufficiently "Pervasive" or "Severe" Discriminatory Harassment

In addition to the absence of proof of discriminatory animus, there is another reason why Dr. Khalaf lacks sufficient evidentiary support for his claim of hostile work environment created by his subordinates. He did not introduce evidence that would allow a reasonable jury to find that he was subjected to harassment that was widespread and significant enough to give rise to a claim.

"A hostile work environment occurs '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (citation omitted; alteration in original); *see also In re Rodriguez*, 487 F.3d 1001, 1010-11 (6th Cir. 2007) (evidence of discrimination based on accent that was sufficient to survive summary judgment on failure-to-promote claim was insufficient to support hostile-work-environment claim).

Alleged harassment in the context of a hostile-work environment-claim must be sufficiently "pervasive" or "severe" to alter the conditions of employment. *Williams*, 643 F.3d at 513. This standard sets a high bar for plaintiffs in order to distinguish meaningful instances of discrimination from instances of simple disrespect. In this court's determination of whether conduct clears that bar, we consider various factors, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* at 512–13 (citing *Harris*, 510 U.S. at 21). "Isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of [a plaintiff's] employment.'" *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "Occasional offensive utterances do not rise to the level required to create a hostile work environment." *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008). "To hold otherwise would risk changing Title VII into a code of workplace civility, a result we have previously rejected." *Id.* (citation omitted).

The alleged comments of Dr. Khalaf's subordinates regarding his "writing and understanding" of English, do not rise to the level of hostility based on national origin to trigger Title VII or ELCRA liability. R.135, 3.14.Tr., PageID 5741-5743. The same can be said of the several isolated comments submitted in one survey conducted by Ford in 2012. That these survey comments are insufficient to establish a pattern of "pervasive" discrimination, is clear when they are compared to far more problematic statements in other cases that have been insufficient to establish Title VII liability. *See, e.g.*, *Williams*, 643 F.3d at 513 (holding that multiple "despicable" statements that were "certainly insensitive, ignorant, and bigoted" did not

constitute "severe or pervasive harassment given their isolated nature and their resemblance to a 'more offensive utterance'").

Therefore, we determine that Dr. Khalaf failed to introduce sufficient proof for a reasonable jury to find the requisite "severe and pervasive" element for the hostile-work-environment claim relating to his subordinates.

### 2. Hostile Work Environment Allegedly Created by Fowler

Although the jury rejected Dr. Khalaf's claim against Fowler of a race-based hostile work environment, it found that Fowler subjected Dr. Khalaf to a national-origin-based hostile work environment. The national-origin claim is a closer call, but we ultimately conclude that Dr. Khalaf presented insufficient evidence to show that Fowler subjected him to a hostile work environment based on either race or national origin.

To support the national-origin claim, Dr. Khalaf states that Fowler was "disrespectful" to him during one-on-one meetings. As QS&PP Department manager, Dr. Khalaf reported directly to Fowler, and therefore was required to meet on a weekly basis with him. R.135, 3.14.Tr., PageID 7515. According to Dr. Khalaf, at these weekly sessions, "Fowler frequently exhibited disrespectful behavior towards [him]," First Appellant Br. at 8, which included Fowler's "pound[ing] the table with his fist in a hostile manner, shouting demeaning things such as: '[W]hat's wrong with you? Don't you *know* English? Don't you *understand* English? Do I have to *spell* every time to you in English? Are you talking down to me? Are you whispering in my ears?'" *Id.* (emphases added).

Dr. Khalaf testified that Fowler was "[v]ery hostile" during their one-on-one meetings. Fowler stated that he was going to "crush" Dr. Khalaf "like an ant." *Id.* During "those hostile moments," Dr. Khalaf testified he "would pray that the earth would open and swallow" him. First Appellant Br. at 8 (quoting R.135, 3.14.Tr., PageID 5717). On other occasions, Fowler would call Dr. Khalaf up to his office, "only to order him to stop and leave as soon as he arrived at the door." First Appellant Br. at 9 (quoting R.135, 3.14.Tr., PageID 5717-5718). And, on "[o]n still other occasions, when Dr. Khalaf brought documents to Fowler's office, Fowler 'bark[ed] commands' to him like 'a dog' telling him not to come close, and to 'drop what he

'ha[d] and leave.'"  First Appellant Br. at 9 (quoting R.135, 3.14.Tr., PageID 5718).  Fowler's comments during these encounters made Dr. Khalaf feel "shocked, horrible, humiliated, [and] devastated," "week after week after week" for months.  First Appellant Br. at 8 (citing R.135, 3.14.Tr., PageID 5717).

Dr. Khalaf alleged further abuse from Fowler at departmental meetings.  On those occasions, Dr. Khalaf's role was to lead the meeting, by both "setting up the agenda" and running the group "through reports from various regions."  First Appellant Br. at 10; *see* R.135, 3.14.Tr., PageID 5722–5723.  However, as Dr. Khalaf explained, Fowler treated him "in a demeaning and disrespectful manner," in front of the entire group, including [] passing him notes [and] demanding that Dr. Khalaf leave the meeting to obtain coffee for [him]."  First Appellant Br. at 10; *see* R.135, 3.14.Tr., PageID 5724-5725.  Similar to his experience during the one-on-one meetings, Dr. Khalaf found this treatment "to be humiliating," and he believed "other attendees had the same reaction to Fowler's conduct."  First Appellant Br. at 10; *see* R.135, 3.14.Tr., PageID 5724–5728.  This behavior continued "every week for months," and Dr. Khalaf contends it constituted national-origin discrimination because he "was the only person of Middle Eastern descent in those meetings—and the only person Fowler asked to fetch him coffee."  First Appellant Br. at 10;  *see* R.135, 3.14.Tr., PageID 5726.

Dr. Khalaf was understandably upset by Fowler's behavior.  But, was there enough proof for a reasonable jury to find a hostile work environment based on Dr. Khalaf's national origin?  We conclude there was not, based on the applicable case law, as we explained below.

We turn first to whether the evidence of Fowler's criticism of Dr. Khalaf's English skills is sufficient to support the jury's finding of a hostile work environment.  We understand that "accent and national origin" are overlapping concepts, and in some circumstances can be "inextricably intertwined."  *Ang*, 932 F.2d at 549.  Or, in other words, "discrimination based on manner of speaking can be national origin discrimination."  *Id.*

For example, in *Rodriguez*, we held that a plaintiff had demonstrated a prima facie case of national-origin discrimination sufficient to survive summary judgment on a failure-to-promote claim.  The plaintiff proffered evidence that the decision-maker in her company had made

"derogatory remarks about [her] accent and ethnicity and statements to the effect that [the decision-maker] 'would not allow her to become a supervisor . . . because of [her] Hispanic speech pattern and accent.'" 487 F.3d at 1006. Similarly, in *Berke*, we found sufficient evidence for a plaintiff's failure-to-promote claim, concluding that "plaintiff was denied two positions . . . because of her accent which flowed from her national origin." 628 F.2d at 981.

However, both *Rodriguez* and *Berke* involved plaintiffs who offered evidence that they were *denied* promotions on direct account of accent-based national origin discrimination by corporate decision-makers. Our court recognizes the difference between discriminatory animus motivating accent-based comments directed at an employee, as in *Rodriquez* and *Berke*, and situations "when a [p]laintiff's accent affects his ability to perform the job effectively," when criticism of English skills does not constitute unlawful discrimination. *Ang*, 932 F.2d at 549; *see also Igwe*, 790 F. App'x at 36 (determining that in certain contexts where a job requires a specific skillset, it is not unlawful to complain of an employee's "communication skills—whether related to his national origin or not"). Other circuits have also recognized the difference between comments motivated by discriminatory intent and legitimate job-specific-related critiques. *See, e.g.*, *Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1048 (8th Cir. 2003); *Bina v. Providence Coll.*, 39 F.3d 21, 26 (1st Cir. 1994) ("references to audience difficulty in understanding [plaintiff] may reasonably be interpreted as expressing a concern about his ability to communicate to students rather than discriminatory animus based on ethnicity or accent"); *Fragante v. City & Cty. of Honolulu*, 888 F.2d 591, 596–97 (9th Cir. 1989) ("[t]here is nothing improper about an employer making an honest assessment of the oral communications skills of a candidate for a job when such skills are reasonably related to job performance") (emphasis omitted)).

Dr. Khalaf presents no evidence that Fowler's statements included any criticism of Dr. Khalaf's accent. Dr. Khalaf also fails to provide any relevant context regarding the referenced statements by Fowler that would allow a reasonable jury to find discriminatory animus. There is no proof that could help a jury and this court assess what motivated the comments. Undoubtedly, Dr. Khalaf's role as QS&PP Department Manager required that he communicate clearly with the team he managed, as well as with Fowler.

And, while Dr. Khalaf was offended by Fowler's comments, a plaintiff's mere subjective offense does not rise to the situations we deemed "discriminatory" in *Rodriguez* or *Berke*.  The plaintiffs in both those cases presented evidence that their accents were the source of their superiors' decisions to deny them job promotions.  Based on those cases, Dr. Khalaf needed to present proof to allow a reasonable inference that Fowler's remarks about Dr. Khalaf's English were really about Dr. Khalaf's accent.  Then, Dr. Khalaf would have to offer evidence to allow a reasonable inference that criticism of his accent was related or motivated by Fowler's animus towards Dr. Khalaf's Lebanese national origin.  This, Dr. Khalaf did not do.

Fowler's derogatory statements, though abusive, were not enough to establish a hostile work environment based on Fowler's national origin.  Rude, yes; discriminatory, no.  Therefore, we hold that there was insufficient evidence to conclude that Fowler's criticism of Dr. Khalaf's English skills and other comments constituted national-origin discrimination.

### B.  Alleged Retaliation

Next, we consider the claims of alleged retaliation against Dr. Khalaf through his demotion, placement on a PEP, and alleged termination.  As noted, the jury found that Dr. Khalaf had been subjected to retaliatory demotion by Ford and Fowler, retaliatory placement on a PEP by Zhou, and retaliatory termination by Ford.

To demonstrate a prima facie case of retaliation under Title VII and the ELCRA, the plaintiff bears the initial burden of establishing that "(1) he . . . engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action."  *Beard v. AAA of Mich.*, 593 F. App'x 447, 451 (6th Cir. 2014) (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)); *see also Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001) (retaliation claims under Section 1981 governed by same standards as Title VII).  "[W]hen it comes to federal antidiscrimination laws like § 1981 . . . a plaintiff must demonstrate that, but for the defendant's unlawful conduct, [the] alleged injury would not have occurred."  *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020) ("This ancient and

simple 'but for' common law causation test, we have held, supplies the 'default' or 'background' rule against which Congress is normally presumed to have legislated when creating its own new causes of action.").

Furthermore, "the Supreme Court . . . made clear that the scope of Title VII's retaliation provision is broader than that of Title VII's discrimination provision." *Niswander*, 529 F.3d at 720 (citing *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)); *see also* Civil Rights Act of 1964, §§ 703(a), 704(a), 42 U.S.C. §§ 2000e–2(a), 2000e–3(a). "In contrast to Title VII's discrimination provision, the 'adverse employment action' requirement in the retaliation context is not limited to an employer's actions that affect the terms, conditions, or status of employment, or those acts that occur in the workplace." *Id.* (citing *Burlington N.*, 548 U.S. at 62–66). "The retaliation provision instead protects employees from conduct that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Niswander*, 529 F.3d at 720 (quoting *Burlington N.*, 548 U.S. at 60).

### 1. Alleged Retaliatory Demotion of Dr. Khalaf by Fowler

We first address whether there is sufficient evidence that would allow a reasonable jury to find that Dr. Khalaf's encouragement of Burke to file a HR complaint against Buche in February 2013 qualified as a "protected activity" under Title VII and the ELCRA. Dr. Khalaf claims that he instructed Pauline Burke, following her phone exchange with David Buche, to file a claim with HR. R.79-8, PX16, PageID 2469 ("I have asked Pauline to file a claim with you because she made accusation over a discussion she had with David []"). Dr. Khalaf contends that Fowler "retaliated" against this "protected activity" in March 2013 by replacing him with Jay Zhou (a higher-level LL3 employee) as Lead QFL responsible for overseeing the QS&PP Department. As a result of Zhou's appointment, Dr. Khalaf was relieved of his former responsibility of managing the Quality Analysts. R. 79-11, PX24, PageID 2480; DX70, App.1.

For a plaintiff to demonstrate a qualifying "protected activity," he must show that he took an "overt stand against suspected illegal discriminatory action." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 288 (6th Cir. 2012) (citations omitted). "In other words, an employee 'may not invoke the protections of the Act by making a vague charge of discrimination.'" *Id.* (quoting

*Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir.2007) (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir.1989) (holding that complaints about "ethnocism" were too vague to constitute protected activity))).

With this legal standard in mind, we find that *Willoughby v. Allstate Insurance Co*., offers a comparable set of facts to what occurred here. In *Willoughby*, the plaintiff claimed he had engaged in a "protected activity" when he sent a three-page letter to his employer following his demotion, which "mention[ed] three previous sexual harassment complaints against" another employee and discussed general unhappiness amongst white employees at his company. 104 F. App'x 528, 530–31 (6th Cir. 2004). Although the plaintiff had mentioned "sexual harassment" in his letter, which could be indicative of his taking a stand against such, we dismissed his complaint because the letter was not actually "asserting discrimination," but rather was intended primarily to "impeach the other employee's credibility" and "contest[] the correctness of a decision made by his employer. . . ." *Id.* (concluding that the "vague charge of discrimination in [[the employee's] internal letter] is insufficient to constitute opposition to an unlawful employment practice") (quoting *Booker*, 879 F.3d at 1313).

Dr. Khalaf's report to Ford's HR Department said even less about discrimination than did the letter in *Willoughby*. Dr. Khalaf's report did not even explicitly characterize Burke as having been "sexually harassed." Nor did Dr. Khalaf ever state that he had instructed Burke to file a sexual harassment or sexual discrimination complaint. Rather, immediately after the incident occurred, Dr. Khalaf indicated that he had "asked Pauline [Burke] to file a claim with [HR] because she made an accusation over a discussion she had with David Buche yesterday." R.79-7, PX15, PageID 2458; R. 79-8, PX26, PageID 2469. Dr. Khalaf's statements were not enough for a reasonable juror to conclude that Dr. Khalaf charged "illegal discriminatory action," as to which he was taking a direct stand. *Blizzard*, 698 F.3d at 288.

There was insufficient evidence to show that Dr. Khalaf's action in response to the February 2013 telephone call was "protected activity" under Title VII or the ELCRA. We therefore **REVERSE** the district court's denial of JMOL on Dr. Khalaf's retaliatory demotion claim.

### 2. Zhou's Alleged Retaliatory Placement of Dr. Khalaf on a Performance Enhancement Plan

The jury determined that Zhou, but not Ford or Fowler, retaliated against Dr. Khalaf by placing him on a PEP. We conclude that this finding was not supported by the evidence based on an evaluation of the undisputed timeline related to Dr. Khalaf's employment, which indicates no connection between Dr. Khalaf's alleged protected activities and Zhou's PEP decision.

Dr. Khalaf encouraged Burke to report the phone incident to HR in February 2013, and he filed his harassment complaint against Fowler and Zhou on April 4, 2014. There is no evidence that either of these acts had any impact on Zhou's decision to place Dr. Khalaf on a PEP. The latter decision was actually made in March 2014, based on documented evidence of Dr. Khalaf's sub-par job performance.

As Dr. Khalaf's counsel conceded at trial, Zhou's imposition of the PEP had nothing to do with the Burke complaint because Zhou was not Dr. Khalaf's supervisor at the time of the complaint: "I'm not going to try to ask the jury to find liability against Zhou for the Pauline Burke complaint; it was before his time." R.141, 3.26.Tr., PageID 6998. Indeed, Zhou joined the QS&PP Department in August 2013, *six months* after the Burke-Buche phone incident occurred. *See id;* DX70, App. 1. Retaliation requires proof "that the individuals charged with taking the adverse employment action knew of the [plaintiff's] protected activity," *Mulhall v. Ashcroft*, 287 F.3d 543, 551–52 (6th Cir. 2002), and there is simply no evidence that Zhou even was aware of Burke's complaint to HR and Dr. Khalaf's actions related to that complaint.

Dr. Khalaf contends that another relevant protected activity motivating Zhou's decision to place him on the PEP was the email he sent to HR manager Wendy Warnick in June 2013.[11] *See* R.37-14, PX 26 PageID 1176-1180. Attempting to support the connection between the email and his eventual placement on a PEP, Dr. Khalaf references the response made by HR supervisor Mike Lank to Dr. Khalaf's question for why he was being placed on a PEP, where Lank stated "you had your chance when you filed your complaint." R.135, 3.14.Tr., PageID 5789.

---

[11]Note that Dr. Khalaf did not reference the email to Warnick in connection with his retaliatory-PEP claim in his response to defendants' Rule 50(a) motion before the district court. *See* R.67, Plaintiff Rule 50(a) Opp., PageID 2361.

According to Dr. Khalaf, this comment alone is sufficient evidence to support the jury's conclusion that Zhou's imposition of the PEP represented retaliation for Dr. Khalaf's protected activity. However, we find no merit in this argument either.

The contents of Dr. Khalaf's email to Warnick and the alleged connection Dr. Khalaf attempts to draw between its transmission and Mike Lank's statement appear tenuous and unclear. As we noted above, in the context of protected conduct claims, employees "may not make[] vague charge[s] of discrimination." *Blizzard* 698 F.3d at 275 (quoting *Fox*, 510 F.3d 587 (quoting *Booker*, 879 F.2d at 1313)). Therefore, it is questionable whether the email, in which Dr. Khalaf described what he perceived as the sub-optimal behaviors of his subordinates, constituted a protected activity in the first place, given that not once did Dr. Khalaf describe an instance of actual discrimination directed towards him based on his race or national origin. R.37-14, PX 26 PageID 1176-1180. Instead, Dr. Khalaf only described what he perceived to be instances of subordinates' disrespect, sub-par work quality, and defensiveness, none of which he explicitly connected to being motivated by subordinates' animus towards his race or national origin. For example, Dr. Khalaf described one subordinate, "Kim," as "[v]ery defensive when a comment or question is raised to a person in [her] section." R.37-14, PX 26 PageID 1179. He described the performance of another subordinate, "Shari," as "[a]lways requr[ing] direction," and characterized her leadership as "aggressive" and "show[ing] a lack of respect." *Id.* Similarly, Dr. Khalaf explained that the leadership qualities of another subordinate, "Jim," included his "[h]aving tendency to get unpolite, nervous, and aggressive in his lack of respect to others including his manager." *Id.*

However, even under the assumption that the email represented a valid protected activity, Dr. Khalaf must show proof that Zhou, the *decision-maker* on the PEP, "knew of the protected activity," *Mulhall v. Ashcroft*, 287 F.3d 543, 551-512, which Dr. Khalaf fails to do. The dearth of evidence showing Zhou had of knowledge of the email is further demonstrated by the facts that (1) the email was addressed to Warnick alone; and (2) the email was delivered in June 2013, two months before Zhou joined the Department. R.37-14, PX26, PageID 1176; *see also* DX 70, App. 1. Finally, Dr. Khalaf fails to show the requisite causality between the June 2013 email and his April 2014 placement on a PEP—an act that occurred *ten* months later. Lank's comment,

without more, is irrelevant, as Dr. Khalaf has shown no connection between the comment and the action of Zhou, the *decision-maker* here.  Furthermore, for causation to be shown between an alleged protected activity and the retaliatory action, "the temporal proximity must be 'very close.'"  *Breeden*, 532 U.S. at 273.  That nexus is clearly not met here, given the ten-month span separating the complaint and the PEP.  For these reasons, there is no evidence from which a reasonable jury could find a connection between Dr. Khalaf's June 2013 email to Warnick and the imposition of the PEP.

Finally, there is no evidence from which a reasonable jury could find a connection between Dr. Khalaf's complaint against Fowler and Zhou and the imposition of the PEP.  Consider the undisputed chronology of events that occurred relating to the PEP decision.  Although Dr. Khalaf notes that his official placement on a PEP (on April 23, 2014) occurred after he filed the April 4, 2014 complaint with HR, there is no evidence in the record from which a reasonable juror could have found that the PEP was caused by Dr. Khalaf's complaint.  The basis for the PEP dated back to November 2013, when Zhou met with Dr. Khalaf about his performance review.  Zhou indicated that Dr. Khalaf was "trending towards a lower achiever & he is expected to improve & sustain expected behaviors."  R.79-16, PX39, PageID 2506.  At that time, Zhou warned Dr. Khalaf that "[i]f there [was] not sustained improvement," Dr. Khalaf would "be placed on a PEP."  *Id.; see also* R.137, 3.19.Tr., PageID 6261-6262; R.135, 3.14.Tr., PageID 5773-5775.  Following this review, Zhou testified, he tried to help Dr. Khalaf improve the noted deficiencies in his job performance, particularly his leadership skills.  Zhou even "went through Ford['s] website to try to find resource[s] . . . for the leadership and development and communications skills development," which he shared with Dr. Khalaf.  R.137, 3.19.Tr., PageID 6262.  However, Zhou testified that he met with Dr. Khalaf again in January 2014, and at this meeting Dr. Khalaf "didn't own [his leadership issues]" or "take responsibility on the items highlight[ed] in the performance review."  R.137, 3.19.Tr., PageID 6265.  Instead, according to Zhou, Dr. Khalaf placed blame on his subordinates.

Meanwhile, despite this initial performance review and follow-up, the relationship between Dr. Khalaf and his team of department employees failed to improve.  Dr. Khalaf's management problems were the focus of a March 2014 meeting between department employees

and Zhou. It was a "very, very painful discussion," Zhou testified, in which "everybody complained about . . . the leadership behaviors of [Dr. Khalaf] and how people are mistreated." Based on these negative responses, Zhou concluded that the "team [had been] destroyed" by Dr. Khalaf. That same month, Zhou made the decision to institute the PEP for Dr. Khalaf. R.137, 3.19.Tr., PageID 6214. In order to officially process the decision, Zhou had to work with HR through late-March 2014, which required that he and HR representatives finalize the wording of the PEP. *Id.* at PageID 6213. On April 2, 2014, HR then sent an email to Zhou approving the final version of the PEP and instructing him that it was "Ok to move forward with delivery" of the PEP on Friday, April 4. R.140, 3.22.Tr. PageID 6851; R.82-5, DX132, PageID 2902. However, on the morning of April 4, 2014, Dr. Khalaf unexpectedly cancelled his scheduled meeting with Zhou, meaning Zhou was unable to deliver the PEP that day. R.82-5, DX135, PageID 2909. That afternoon Dr. Khalaf sent an email to HR complaining about the alleged harassment by Fowler and Zhou. R.79-24, PX64, PageID 2536.

"To establish a causal connection between the protected activity and the adverse employment action, a plaintiff must present evidence 'sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action.'" *In re Rodriguez*, 487 F.3d 1001, 1011 (6th Cir. 2007) (quoting *Walcott v. City of Cleveland*, 123 F. App'x 171, 178 (6th Cir. 2005) (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir.1997))).

There was no proof presented at trial to allow for a reasonable inference that the PEP resulted from Dr. Khalaf's complaint about Fowler and Zhou. The district court acknowledged the specific sequence of events outlined above, even recognizing that (1) Zhou did not become Dr. Khalaf's manager until months after Dr. Khalaf's actions related to the Burke complaint in February 2013; and (2) that "the PEP paperwork was processed before [Dr. Khalaf] made his April 2014 harassment complaint" about Zhou and Fowler. R.115, JMOL Order, PageID 5122 (emphasis added). Nonetheless, the court denied judgment as a matter of law to Zhou, rationalizing that "the evidence at trial demonstrated a continuous course of conduct aimed at [Dr. Khalaf] following his protected activity." *Id.* Respectfully, we believe the district court did not adequately account for the lack of evidence that Zhou actually knew about Dr. Khalaf's first protected activity (encouraging Burke to report the February 2013 call sexual harassment

incident) or second protected activity (the June 2013 email) or that the PEP had anything to do with the third protected activity (reporting alleged harassment under Fowler and Zhou to HR).

Ultimately then, because there was no evidence to support a continuous course of retaliatory conduct aimed at Dr. Khalaf following any protected activity, there was no basis for a reasonable jury to find the requisite causation for Dr. Khalaf's retaliation claim. Therefore, we **REVERSE** the district court's denial of JMOL on Dr. Khalaf's retaliatory PEP claim against Zhou.

### 3. Dr. Khalaf's Alleged Retaliatory Termination by Ford

Finally, Ford argues that it is entitled to JMOL on Dr. Khalaf's retaliatory termination claim. Ford advances two arguments: (1) that undisputed evidence shows that Dr. Khalaf was not actually terminated; and (2) alternatively, that even if he had been terminated, Dr. Khalaf's undisputed refusal to take the job offered to him by Ford constituted a legitimate, non-retaliatory reason for Dr. Khalaf's termination. We agree with Ford's first argument and do not address the second.

Dr. Khalaf was on a medical leave of absence from June 28, 2014 through July 13, 2015. R.135, 3.14.Tr., PageID 5824. Dr. Khalaf ended his leave of absence after his benefits under his disability plan terminated. Ford then conducted a generalized search for open positions suitable for Dr. Khalaf's experience and skillset; however, Ford was unable to identify any available jobs at Dr. Khalaf's old management level (LL5) and made this clear to Dr. Khalaf. *Id.* at 5824-5826; R.80-14, PX132, PageID 2597. Dr. Khalaf even conducted a search himself and could not identify any available managerial jobs at his former LL5 level, only finding non-management LL6 positions. R.136, 3.15.Tr., PageID 5909-5911. Ford then offered Dr. Khalaf an LL6 job, with an August 31, 2015 deadline for acceptance. Though this was a lower level position than Dr. Khalaf previously held, Ford indicated that the job would be at the same rate of pay as Dr. Khalaf's prior LL5 job. R. 135, 3.14.Tr., PageID 5806-5807, 5824-5825; R.80-12, PX122, PageID 2587; R.80-14, PX132, PageID 2597. But, on August 28, Dr. Khalaf rejected Ford's job offer and he accepted a position with another Michigan-based corporation, BASF. The new job

gave Dr. Khalaf a higher salary, as well as a signing bonus.  R.135, 3.14.Tr., PageID 5818, R.136, 3.15.Tr., PageID 5911-5915.

This evidence cited by Ford establishes that Dr. Khalaf cannot establish his retaliatory-termination claim because Ford offered him the only available and reasonable job at the time, which Dr. Khalaf refused in order to accept the BASF job offer.  Therefore, Dr. Khalaf was not terminated.  *See, e.g.*, *Green v. Brennan*, 136 S. Ct. 1769, 1777 (2016) ("An ordinary wrongful discharge claim . . . has two basic elements: discrimination and *discharge*.") (emphasis added); *Evans v. Davie Truckers, Inc.*, 769 F.2d 1012, 1014 (4th Cir. 1985) (concluding that the "evidence clearly established that [the employee] voluntarily resigned his employment with the defendant, [he] suffered no adverse employment action at the hand of the defendant").  "The sine qua non of a discharge case is, of course, a discharge." 1 B. Lindemann, *et al.*, Employment Discrimination Law 21–33 (5th ed. 2012).

The district court recognized this logic when it initially announced its intention to direct a verdict in favor of Ford.  R.143, 3.28.Tr., Page ID 7237-7238.  However, a year later, the court reversed its initial view on the question of Dr. Khalaf's termination.  R.115, JMOL Order, PageID 5117.  In denying Ford's motion for JMOL, the court cited Dr. Khalaf's perception that the job offered by Ford (1) was not at the same grade as his pre-disability job, and therefore could potentially affect Dr. Khalaf's future bonuses; and (2) would alter Dr. Khalaf's seniority date, thus potentially affecting his pension benefits.  *Id.* at PageID 5116.  The court also cited Dr. Khalaf's statements of *subjective* belief (1) that he would have had to "self-demote to return to work"; and (2) that, given HR Director Mike Link's testimony "that Ford [had] offered [Dr. Khalaf] money if he separated," this offer represented an effective termination, because in the ordinary course of business "Ford does not offer money to voluntary quits."  *Id.* at PageID 5116.

The district court erred in its emphasis on evidence of Dr. Khalaf's subjective belief unsupported by objective facts.  Any reduction in grade or benefits, or perception of "self-demotion" related to a job, does not indicate that Dr. Khalaf was actually terminated.  Dr. Khalaf's perceptions regarding his new role were merely *assumptions* based on his "review and understanding of Ford policies." R.135, 3.14. Tr., PageID 5811-5812.  In fact, these assumptions were incorrect, as established by the testimony of a Ford employee with knowledge about the

seniority date that would have been assigned to Dr. Khalaf. R.140, 3.22.Tr., PageID 6849-6850, 6873-6875. Therefore, there is no evidence to show that Dr. Khalaf would have lost his seniority or would have lost his ability to participate in Ford's defined-benefit plan. R.135, 3.14.Tr., PageID 5811-5812.

If anything, the factors Dr. Khalaf references as demonstrating actual discharge under Ford would be more appropriate for a "constructive discharge" claim, *Logan v. Denny's Inc*., 259 F.3d 558, 569 (6th Cir. 2001).[12] However, constructive discharge was never presented by Dr. Khalaf as a theory for the jury to consider. The only question that the jury was asked to decide relative to Dr. Khalaf's alleged termination was whether he was *actually terminated.*

"An actual discharge . . . occurs when the employer uses language or engages in conduct that would logically lead a prudent person to believe his tenure has been terminated." *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 979 (10th Cir. 2008) (quoting *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 88 (2nd Cir. 1996)); *see also Pennypower Shopping News, Inc. v. NLRB*, 726 F.2d 626, 629 (10th Cir. 1984) ("The test of whether an employee has been discharged depends on the reasonable inferences that the employee could draw from the statements or conduct of the employer."). "An actual discharge does not occur, however, when the employee chooses to resign rather than work under undesirable conditions." *Id*.

It is undisputed that, after engaging in a search of available positions, Ford offered Dr. Khalaf a job that he refused. There is no evidence in the record suggesting that Ford used any "language" or "conduct" that "would logically lead [Dr. Khalaf] to believe his tenure [had] been terminated." *Forestwood*, 525 F.3d at 979. While Dr. Khalaf may have assumed the new job offered to him by Ford represented a termination based on his personal "review and understanding of Ford policies," R.135, 3.14. Tr., PageID 5811-5812, as we noted above, these

---

[12] "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Id*. Our analysis of the first prong "depends on the facts of each case." *Id*. "[W]e consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status." *Id*. Based on the evidence presented by Dr. Khalaf, it may be questioned whether he would have been even able to demonstrate evidence of a constructive discharge, but we do not address that issue because Dr. Khalaf did not raise it.

assumptions were incorrect, as established by the testimony of a Ford employee who possessed knowledge of the new seniority date assigned to Dr. Khalaf. Based on these facts, we hold that no reasonable juror could have concluded that Dr. Khalaf was actually discharged based on Ford's actions. *See Pennypower Shopping News* 726 F.2d at 629.

Dr. Khalaf's reference to Lank's testimony (where he stated that Ford does not generally offer severance pay to employees who voluntarily quit, yet offered severance to Dr. Khalaf) does not change our conclusion. R.140, 3.22.Tr., PageID 6869. This is because Lank qualified his statement, explaining how the circumstances were different in Dr. Khalaf's unique situation. Namely, as was the case with Dr. Khalaf upon his return from disability leave, when a Ford employee's position "goes away" or is no longer available, and the only replacement position "available" to that employee requires a reduction in level, then Ford's personnel system classifies the situation "as an involuntary separation," which thereby qualifies that employee for severance benefits. *Id.* at 6871. This was the case with Dr. Khalaf because, after conducting its search, Ford did not locate a position available at Dr. Khalaf's prior LL5 management level—meaning Dr. Khalaf would have necessarily been reduced to an LL6 position (though that position offered the same salary and benefits). Therefore, under Ford's internal classification nomenclature, Dr. Khalaf's rejection of the offer and departure represented "an involuntary separation," *id.* at PageID 6871-6872, meaning Dr. Khalaf would be eligible for "some [severance] pay." *Id.* Regardless of Ford's internal classification, however, it is clear that Dr. Khalaf "was given a choice to take the [Ford] position and he chose not to," *id.* at PageID 6870; instead, he chose to separate from Ford in order to take a higher paying job at BASF.[13]

For these reasons, we conclude that there was insufficient evidence to allow a reasonable jury to find that Dr. Khalaf was not actually terminated by Ford. Therefore, we **REVERSE** the district court's denial of JMOL on Dr. Khalaf's retaliatory termination claim.

---

[13] Additional support for Lank's description of Ford's internal personnel classifications comes from the "Salaried Involuntary Reduction Process Approval Form" signed by Fowler, Zhou, and other Ford representatives on September 1, 2015 to document Dr. Khalaf's departure. That form explains that Dr. Khalaf was offered an LL6 position, but "failed to accept the position by the specified deadline of 12:00 p.m. on August 31, 2015," and therefore, Dr. Khalaf was "involuntarily separated from Ford Motor Company." R.80-14, PX132, PageID 2597.

### III. CONCLUSION

In sum, we hold that the district court erred in denying defendants' motions for judgment as a matter of law. Accordingly, we **REVERSE** the district court court's judgment and remand for entry of judgment in favor of defendants.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 19-1435/1468

FAISAL G. KHALAF, PH.D.

    Plaintiff - Appellant/Cross - Appellee,

    v.

FORD MOTOR COMPANY; BENNIE FOWLER; JAY ZHOU,

    Defendants - Appellees/Cross - Appellants.

---

> **FILED**
> Aug 31, 2020
> DEBORAH S. HUNT, Clerk

---

Before: GUY, THAPAR, and BUSH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is REVERSED and REMANDED for entry of judgment in favor of defendants.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk